UNITED STATES OF AMERICA,                          CRIMINAL NO. 10-83 (JNE/JSM)

      Plaintiff,

v.                                                                          REPORT AND
                                                                               RECOMMENDATION

DAVID RICHARD ROSETTER (1),
LAUMATAFIAFIA T. ROSETTER (2), and
VATAUOMALAO DORTHEA TAFAOA (3),

      Defendants.

JANIE S. MAYERON, United States Magistrate Judge

The above matter came on for hearing before the undersigned upon Defendant David Richard Rosetter's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 65] and Motion to Suppress Statements, Admissions, and Answers [Docket No. 66]; defendant Laumatafiafia T. Rosetter's Motion to Suppress All Evidence Obtained from Unlawful Searches and Seizures [Docket No. 35], Motion to Suppress Statements Made by Defendant [Docket No. 37], and Motion to Suppress All Electronic Surveillance Evidence and All Disclosed Electronic Communications and Any Evidence Derived Therefrom [Docket No. 38]; and defendant Vatauomalao Dorthea Tafaoa's Motion for Suppression of Physical Evidence [Docket No. 42] and Motion for Suppression of Statements [Docket No. 44].

Lisa Kirkpatrick, Assistant United States Attorney, appeared on behalf of the United States of America; Douglas Olson, Esq., appeared on behalf of defendant David Richard Rosetter, who was personally present; Daniel L. Gerdts, Esq. appeared on behalf of defendant Laumatafiafia T. Rosetter, who was personally present; and

Matthew D. Forsgren, Esq. and Ankoor Bagchi, Esq. appeared on behalf of Vatauomalao Dorthea Tafaoa, who was personally present.

The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

## I.    BACKGROUND

Defendants are all charged with aiding and abetting one another to commit 9 counts of extortion in violation of 18 U.S.C. § 2 and 844(e).  Indictment [Docket No. 1].  More specifically, the Indictment charged that on nine different occasions between January and June of 2007, defendants, through the use of the telephone, internet, wire transfers and other instruments of interstate or foreign commerce, threatened and maliciously conveyed false information concerning alleged attempts to kill, injure or intimidate other individuals.  Id.

### A.    The Alleged Extortions

Before addressing the substance of each defendant's motion, the Court provides the following overview obtained from the testimony of FBI Special Agent Michael Dudley at the motions hearing on July 20, 2010.

Defendants David Rosetter ("David") and Laumatafiafia Rosetter ("Fia") are husband and wife.  Tr. 16.  Defendant Vatauomalao Rosetter ("Tau") is Fia's sister and has been adopted by David and Fia as their daughter.  Tr. 16-17.  Fia and Tau are Samoan.  Tr. 18.  The victims of the alleged extortion are the parents of David, Richard and Joan Rosetter, and David's sister, Luann Rosetter (collectively "the Rosetters").  Tr. 17.

In early 2005, David's parents went to visit David in San Diego, California, where he was stationed as an officer in the United States Navy.  Tr. 19.  During this trip, David's parents were led to believe that Fia had a relative in the Samoan Mafia named "Papa Mo," "Big Mo" or "Uncle Mo."[1]  Tr. 17.  Tau, Fia and David also told the David's parents that Tau had a workers' compensation lawsuit dispute with Wal-Mart, and that she was going through a nasty divorce with her husband.  Tr. 17.  The parents were led to believe that Wal-Mart was possibly surveilling the Rosetters as a family.  Tr. 18-19.

David was subsequently transferred by the Navy from San Diego to Norfolk, Virginia.  Tr. 19.  On the trip from California to Virginia in November of 2005, David, Fia, their two children, and Tau stopped in Rapid City, South Dakota, where Luann lived.  Tr. 20.  David had first called Luann and told her that the Rosetter family was in trouble, and that she should keep an eye out for strange things.  Tr. 20.  Once they arrived, David, Tau and Fia told Luann that the Wal-Mart attorneys and the attorneys for Tau's husband in the divorce had gotten together and hired a Mexican gang called the "Burritos" to harass, stalk and kill the Rosetter family.  Tr. 20.  They also told Luann that the family was in danger, and they needed to get their parents from Minnesota to Rapid City as soon as possible.  Tr. 20.  Luann relayed the story and got her parents to come to Rapid City.  Tr. 20.

For the next two weeks, the Rosetters ran around Rapid City thinking they were being pursued by hitmen.  Tr. 20.  The Rosetters were also informed by David, Fia and Tau that Uncle Mo and the Samoan Mafia were also in Rapid City to protect the Rosetter family.  Tr. 21.  During these two weeks, the Rosetters were led to believe that

---

[1]     Agent Dudley uses "Papa Mo" and "Uncle Mo" interchangeably throughout his testimony to refer to the same person.

the Samoan Mafia was engaged in battles with the hitmen, and the Rosetters were alerted to the impending attacks by the Burritos by phone calls from Uncle Mo.  Tr. 21. The phone calls were always taken by Tau or Fia – no one else ever spoke to Uncle Mo, saw the Samoan Mafia or Uncle Mo, saw the hitmen or evidence from the battles, but the Rosetters were told they existed and believed they existed.  Tr. 21.

The Rosetters purchased guns while they were in Rapid City and went to a shooting range and practiced shooting.  Tr. 22.  Furthermore, the Rosetters were told that Uncle Mo and the Samoan Mafia had uncovered another plot by some Rapid City contractors who were working on Luann's home and these contractors were plotting to kill Luann and steal her home.  Tr. 22.  After a couple of weeks of running around Rapid City, Uncle Mo communicated through Tau and Fia that the family should caravan back to Minnesota, which they did.  Tr. 22.  Luann also went to Minnesota, leaving her job in Rapid City.  Tr. 22.

After arriving in Granite Falls, Minnesota, where the Rosetters lived, Tau returned to California, and Fia and David sat down with the Rosetters and told them what Uncle Mo wanted them to do to protect themselves.  Tr. 23.  These steps included Luann changing her name, getting rid of all of the family vehicles, changing their appearances, making structural changes to the house (such as putting metal plates in the attic so that they could be protected from bullets shot through the ceiling), and getting rid of the family dog because he was recognizable.  Tr. 23.  They were also told that Uncle Mo was going to put them under electronic and physical surveillance for their own protection.  Tr. 23.  The Rosetters followed all of these directions.  Tr. 23.  David and Fia went on to Norfolk after a couple of days.  Tr. 24-25.

During 2006, the Rosetters lived reclusively. Tr. 23. The parents obtained concealed-to-carry weapons permits and carried guns. Tr. 23. Luann stayed in hiding; she never returned to Rapid City and sold her house. Tr. 23. When Luann went to a courthouse in Minnesota to change her name, she hid in the back of a truck with a blanket over her so she could not be seen. Tr. 24.

In January of 2007, David made a phone call to the Rosetters telling them that Uncle Mo was angry at him, and that he needed them to wire money. Tr. 25. The Rosetters made several wire transfers in January. Tr. 26.

Towards the end of April 2007, Tau emailed the Rosetters saying that David did something that made Uncle Mo angry. Tr. 26. Tau followed up with a phone call in which she told the Rosetters that David had fathered a child with a stripper from Guam, that he had been using his and Fia's financial resources to care for this other woman and child, and therefore, Fia and David's sons were in need of money. Tr. 26. Uncle Mo was upset about this because Fia was made to suffer financially and because the family's honor was damaged by what David had done. Tr. 26. The Rosetters were told they needed to send money to pay credit card debts and other expenses. Tr. 26. David's father suggested that perhaps the best thing to do would be to file bankruptcy, which led to Uncle Mo sending graphic and threatening emails to the Rosetters, telling them to send large sums of money or face dire physical consequences to themselves and to their extended family. Tr. 27. These emails continued through the beginning of June 2007. Tr. 27.

As of June 2007, the Rosetters had sent approximately $180,000 and had no more money, so they tried to get loans from the bank. Tr. 27. The bank wanted to

know how they intended to use the money and the Rosetters were afraid to tell them. Tr. 27. The Rosetters finally told the banker they were being extorted, and the banker contacted the authorities. Tr. 28.

Through the course of investigation, the FBI discovered that Uncle Mo, the gang known as the Burritos, and the illegitimate child of David Rosetter, were all fiction. Tr. 28.

### B.     Search Warrants

During the course of the Government's investigation, agents interviewed the Rosetters and learned that they had received a number of emails from Uncle Mo and the defendants. Based on those interviews, during 2007 and 2008, five search warrants for email accounts associated with defendants were issued. See Gov't Exs. 1A, 2-4, 5.[2]

### C.     The Interviews of Defendants

In January 2009, Agent Dudley and Agent Jeff Stankevitz interviewed David, Fia and Tau in Hawaii, where David had been transferred from Norfolk. Tr. 28.

Agent Dudley first contacted David on January 14, 2009, at David's office on the Naval Base in Pearl Harbor, Hawaii at approximately 8:30 a.m. Tr. 29. Agent Dudley identified himself and explained that he had some questions about David's involvement with Papa Mo or Uncle Mo and the Samoan Mafia. Tr. 29. David said he did not know Papa Mo or anything about the Samoan Mafia. Tr. 30. Agent Dudley then confronted David with a number of emails which had been sent to David at his Navy email account

---

[2]     At the motions hearing, Government Exhibits 1 and 5 were submitted as copies of search warrants that were signed on June 26, 2008, but those copies did not have the signature of the judicial officer. Exhibits 1A and 5A, which are copies of the same warrants but which contain the signature of the judicial officer, were submitted by the Government to the Court after the hearing.

from Papa Mo, at which point David cooperated. Tr. 30-31. David said he had never met Papa Mo or seen him, but that Papa Mo had been giving him instructions and that David had always followed these instructions, including making calls and asking for money or during one call to his family, telling them that he was dying of cancer. Tr. 31. David felt under threat from Uncle Mo to make these calls. Tr. 31.

Agent Dudley was alone with David initially in David's office, and was then joined by Agent Stankevitz. Tr. 31. At no time did Agent Dudley tell David that he had to speak with him. Tr. 31. David never exhibited any hesitation talking to Agent Dudley, was cooperative, and answered all of Agent Dudley's questions. Tr. 32.

Agent Dudley was at David's office for a little less than an hour, after which the interview was moved to the Naval Criminal Investigative Service ("NCIS") office, approximately 20-30 minutes away from David's office. Tr. 32. The interview was moved to NCIS after David and Agent Dudley discussed the fact that David conducted business at his office, and there would be phone calls and people dropping by. Tr. 33. Agent Dudley suggested moving the interview because it would take another couple of hours to complete. Tr. 33. Agent Dudley asked if David was willing to go to the NCIS office, where there would be more privacy, and David agreed. Tr. 33. David told his secretary that he would be showing Agents Dudley and Stankevitz a few of the sights around the base. Tr. 33. David never objected to leaving his office and going to the NCIS office. Tr. 33.

After arriving at the NCIS office, David went to the restroom and got some water, and they went into a large conference room. Tr. 34. The conference room was approximately 40 feet long and contained a 20-foot-long table. Tr. 34. The door to the

room was open, and the only people in the room were Agents Dudley and Stankevitz and David.  Tr. 34.  Agent Dudley was dressed down and his sidearm was concealed.  Tr. 34.

When they first arrived at the NCIS office, Agent Dudley explained that he wanted to go into more detail about the scheme, and reviewed with David that David was there voluntarily, and that any statements he made would be voluntary.  Tr. 35.

During the interview, David made a written statement.  Gov't Ex. 9.  Agent Dudley helped guide David in writing his statement and made suggestions.  Tr. 79.

Prior to making the written statement, Agent Dudley followed his standard protocol for people who are giving statements:

Q. What is that protocol?

A. Well, I've got kind of a standard spiel that I give them when I tell them about their opportunity to make a written statement. I tell them that I'm going to write a report in which I put down, you know, my version of what is said of what they told me. And I said, If you want the opportunity to write a written statement in your own hand about what you told me, you know, both pro and con, then this is your opportunity. You don't have to do it. But if you want to do it, you can.

Tr. 36-37.  Agent Dudley noted in his FBI 302 Report that he had informed David that "this was his opportunity to respond.  This statement was voluntary."  Tr. 94.

David was left alone on numerous occasions at the NCIS office while the agents ran out and did other things, and talked to people outside of David's presence.  Tr. 34.  David had a cell phone with him.  Tr. 35.  There were not many people around the office.  Tr. 34.

During the course of David's contact with the agents, he was not threatened, the agents made no promises to him other than that they would pass along his cooperation

to prosecuting authorities, the tone was conversational, David did not appear under the influence of drugs or alcohol, he was never handcuffed, and he was never arrested. Tr. 38, 62. David never asked to stop the interview or to speak to an attorney. Tr. 38.

David received a phone call from Fia during the interview, asking him to pick up his son. Tr. 39. After the interview, the agents transported David back to the Base around 1:00 p.m., where David and another agent, Vaughn Roe, drove in David's car to pick up David's son. Tr. 37, 39, 95. Agent Roe accompanied David because Agent Dudley was concerned that David would call Fia and warn her that the Agents Dudley and Stankevitz were coming to speak with her. Tr. 39-40. Agents Dudley and Stankevitz planned to go to David's house to see Fia, and if Fia was cooperative, to interview her at the NCIS office rather than at home where kids were running around. Tr. 40. Agent Dudley asked David if he would mind if an agent rode along with David to pick up his son, and David said he did not mind. Tr. 40. David agreed to return to the house to watch the children, and was waiting for a call from the agents before returning home. Tr. 40.

Agents Dudley and Stankevitz went to David and Fia's house around 1:00 p.m., knocked on the door, and identified themselves as FBI agents when Fia answered the door. Tr. 41. Fia was home with a small child. Tr. 41. Special Agent Lockley with NCIS waited outside the home. Tr. 97. Agents Dudley and Stankevitz told Fia they had spoken with David and that they had some questions for her. Tr. 41. Fia invited the agents into the house and they sat down with her in the living room. Tr. 41. Her preschool-age son was present. Tr. 96-97. The agents explained that they were concerned about Papa Mo and the emails giving David directions. Tr. 41. Fia said that

David had been sort of crazy since he returned from Iraq, and none of the story was true. Tr. 42. Fia also said that David's family interfered with their marriage, and that there were no financial issues and no financial interaction between David and his parents. Tr. 42.

After speaking with the agents for a little less than a half hour, Fia prepared a written statement, denying knowing Uncle Mo and denying any financial difficulties. Tr. 42-43. Gov't Ex. 6. Agent Dudley wrote out the statement and Fia signed it. Tr. 85-86; Ex. 6. After Fia made the statement, the agents confronted her with evidence at odds with the statement, such as records of wire transfers from the Rosetters to Fia, threatening emails received by the Rosetters that were signed by Papa Mo or Uncle Mo, and a tape-recording between Fia and Luann Rosetter referring to Papa Mo. Tr. 43. The tape recorded conversation between Fia and Luann was made by Luann in Granite Falls, Minnesota upon the request of Agent Dudley. Tr. 44. The conversation was recorded on June 22, 2007. Tr. 83.

After presenting the evidence of the extortion plot to Fia, Agent Dudley asked if Fia could guess the IP address of the emails signed by Papa Mo, and she stated that the address would return to her residence and that she did it. Tr. 44. At that point, Fia admitted that everything she had denied was true, the events that occurred in Rapid City were true, and she and her sister had concocted the story of the Guam stripper because they needed money and they hated the Rosetters because they were racist and had treated them poorly. Tr. 45. This confession was reflected in a second written statement made by Fia at the NCIS office. Tr. 46; Gov't Ex. 7.

The agents decided to go to the NCIS office so that David could return his son to his home, and because they did not want to try to take a statement from Fia with kids running around. Tr. 47. Consequently, they asked Fia if she had any objection to continuing the interview at NCIS and she said she had no objection and was willing to accompany the agents to NCIS. Tr. 47. The agents and Fia waited at the house until David returned. Tr. 47. While waiting, Fia offered the agents a bottle of water and received a phone call from Tau. Tr. 48. Fia told Agent Stankevitz that she informed Tau that the FBI was there and she was speaking to them. Tr. 48.

Fia, Agent Dudley and Agent Lockley rode together in a car to the NCIS office; the car was a regular, non-squad car without a cage inside. Tr. 48, 98. Fia was not under arrest at that time. Tr. 49. Agent Dudley and Fia chatted about the case on the way to the NCIS office, the tone of the conversation was chatty, and Fia chuckled over some of the things they had pulled on David. Tr. 49. Fia agreed that her husband was not very bright. Tr. 49.

Agent Dudley could not recall whether the NCIS office was in an area of the Naval Base where credentials were necessary, but recalled a security checkpoint at which he showed his identification. Tr. 90, 93.

After arriving at the NCIS office, Agent Dudley asked if Fia was interested in providing a written statement. Tr. 49. Using the same protocol he had used with David, Agent Dudley told Fia that providing a written statement was voluntary and she did not have to do it; he recorded the use of the "written statement spiel" in his FBI 302 report by indicating that he had told her that "it was voluntary. If she wanted to make a statement, she could. She didn't have to." Tr. 49-50, 100. As he had done at the

house, Agent Dudley told Fia that it was a serious matter that would be turned over to a prosecutor to look at for criminal charges, and again asked Fia if she wanted to give her version, and she said she did. Tr. 50.

Fia provided the second written statement which she wrote out herself. Gov't Ex. 7; Tr. 50, 86. If any changes were made during the writing of the statement, both Fia and Agent Dudley initialed the changes. Tr. 87. Agent Dudley also signed this statement at the bottom. Tr. 87.

The agents did not anticipate that Fia's interview would last as long as David's, and the conference room that was used for David's interview was being used. Tr. 50. As a result, Fia's interview took place at the NCIS office in a small room, about ten feet by ten feet. Tr. 50. At no time did Fia ask for an attorney or ask that the questioning stop. Tr. 51. The agents did not threaten Fia, use physical coercion or make any promises other than to tell her that the agents would pass along her cooperation to prosecuting authorities. Tr. 51, 62. The agents told Fia she could go to the restroom and she could get a snack, but never told her she could leave or that she was free to go. Tr. 100. Agent Dudley agreed that if Fia got up and started walking out the door, she would still be inside the secure NCIS facility, and as she did not drive, she would need someone to drive her home or she would have to walk a distance that would take a half hour to drive. Tr. 100-01. However, given Fia was a spouse of someone in the military, Agent Dudley did not know whether she had a military ID which would allow her to get through the military checkpoint. Tr. 101.

Fia was extremely cooperative, friendly and cordial throughout the interviews at the house and at the NCIS office. Tr. 52. She told Agent Dudley she was thankful for

pointing out to her that her hatred of the Rosetters had come back to hurt her children. Tr. 52. Fia did not appear to be under the influence of drugs or alcohol, tracked the conversation, and spoke excellent English without any need for a translator. Tr. 53.

Realizing that he had two conflicting sworn statements from Fia, Agent Dudley asked Fia if she would provide a third statement making clear that her first statement contained lies and her second statement contained the truth. Tr. 53. Fia wrote out the third statement. Tr. 54; Gov't Ex. 8. Agent Dudley told her to put in the third statement which of the first two statements was true and which was false. Tr. 85.

The agents asked Fia if she thought Tau would be willing to come and give as statement as well, and Fia said she thought Tau would. Tr. 55. Because Fia believed Tau would not answer a number she did not recognize, Fia suggested that David could call Tau and give her Agent Dudley's number to call, which is what occurred. Tr. 55. When Agent Dudley received the call, he gave the phone to Fia, who spoke to Tau in Samoan and she then gave the phone back to Agent Dudley, who asked Tau if she would be willing to come and discuss Papa Mo and the Rosetters. Tr. 55-56. Tau said she would come talk to them. Tr. 56.

Tau was not sure where the NCIS office was located, so she went to David and Fia's home and followed Agent Stankevitz to the NCIS office in her own vehicle. Tr. 56, 112. Agent Dudley did not know or think about whether Tau had military identification or whether she would be able to get into the NCIS facility without Agent Stankevitz. Tr. 103, 112.

After Fia's interview, the agents asked Fia if she wanted to leave and go walk around or what she wanted to do; she asked if the NCIS agent and Agent Dudley would

stay with her in the room and continue talking to her while they waited for Tau to arrive. Tr. 54-55.

The agents were chatting with Fia when Tau arrived around 5:00 p.m. Tr. 57. Fia waited for Tau and took a nap in the waiting room because Tau was going to give her a ride home. Tr. 57. No agents waited with Fia while Agents Dudley and Stankevitz were speaking with Tau. Tr. 58.

During the interview with Tau, Agent Stankevitz took the lead. Tr. 58. The interview was conducted in the same room as Fia's interview. Tr. 59. The agents made it clear to Tau early on in the interview that it was a criminal investigation and she might get charged. Tr. 60. Prior to Tau providing her written statement, Agent Dudley used the same protocol to inform her that her statement was voluntary.

> Q. And I apologize if you already testified to this, but did you go through that same spiel that you already testified about as to Fia Rosetter?
>
> A. Yeah. I gave Tau the same spiel, that, you know, this was her chance to put it in her words the way she wanted it told, that we were going to do a report, and that's where -- you know, I told her that she didn't have to, and she kept saying, "I want to cooperate." She repeated numerous times throughout the interview, "I want to cooperate fully." "I want to be fully cooperative. And we repeated the fact that, you know, criminal charges could result but that we weren't the ones to make that decision, but she should know that could happen.

Tr. 61-62. Agent Dudley admitted there was no mention in the FBI 302 report that he had given her this spiel and that was an error. Tr. 107-08.

Tau was extremely cooperative, and seemed eager to tell the agents about what the Rosetters had put her family through in terms of racism. Tr. 59. Tau readily admitted her role, which was basically hatching the scheme, and confirmed sending an email to the Rosetters by initialing a copy of the email given to her by Agent Stankevitz.

Tr. 59-60. Tau also gave a written statement. Tr. 60; Gov't Ex. 10. Agent Dudley suggested that Tau could note in her statement how she had been treated by the agents generally, and Tau wrote:

> I, Vatau Tafaoa, was treated very fairly and equally in every way by the FBI agents, Mr. Mike and Mr. Geoff. They were very straight forward and to the point and they both did it with utmost respect for the individual and very truthfully, in other words, "straight-up" with me at all times.

Gov't Ex. 10, p. 4.

Agent Dudley dictated the last sentence to Tau, which declared that the statement was true and correct made under penalty of perjury. Tr. 109; Gov't Ex. 10. Tau finished the interview around 6:30 p.m., and most of the time she spent at the NCIS office was writing out the statement. Tr. 61.

Tau never asked for an attorney, to terminate the interview, or stop the interview. Tr. 62. Tau was not threatened, and no promises were made to her other than that the agents would pass along her cooperation to prosecuting authorities. Tr. 62. However, prior to giving the interview, Agent Dudley never told Tau that she could leave at any point, she was free to leave, she could take Fia and go home, or she could contact an attorney. Tr. 106-07.

Tau spoke English well, responded appropriately to questioning, and did not appear to be under the influence of drugs or alcohol. Tr. 63. Tau informed the agents that Fia told her to be straight with the agents and that the agents had treated her well. Tr. 63.

Agent Dudley testified that after the interviews concluded, he was concerned about David because in one day, David had learned that there was no Papa Mo, that his wife had extorted $180,000 out of his parents, and the incidents in Rapid City were

concocted to make fun of the Rosetter family.  Tr. 64.  Agent Dudley made temporary arrangements for David to stay elsewhere for a couple of nights, and Agent Dudley suggested to Fia that he accompany her back to the house and put things in perspective before David left for the temporary housing.  Tr. 65.  Fia agreed that was a good idea.  Tr. 65.  Tau and Fia drove back to the Rosetter residence in Tau's vehicle, and Agents Dudley and Stankevitz followed in another car.  Tr. 65.  To leave the Base, Fia and Tau had to go through the security checkpoint.  Tr. 111.

Once everyone arrived at David and Fia's house, Tau took the children into another room and David, Fia and the agents sat down in the living room.  Tr. 65.  Fia told David about extorting his parents and why she had done it, and David was emotional as he heard it.  Tr. 65.  The meeting lasted approximately a half hour.  Tr. 65.  David made no incriminating statements, and Fia's comments to David were consistent with what she had told Agent Dudley earlier.  Tr. 66.

The following day, January 15, 2009, Agents Dudley and Stankevitz stopped at the Rosetter residence to see how things were going, and Fia answered the door and said that maybe she should not speak with them until she got an attorney.  Tr. 67.  The agents left.  Tr. 67.

On January 16, 2009, Tau called Agent Dudley.  Tr. 67.  Agent Dudley returned the call while he and Agent Stankevitz were waiting for a flight at the airport.  Tr. 68.  Tau informed Agent Dudley that she was leaving Hawaii to go back to Samoa because she had never planned on living permanently in Hawaii, and said that if the agents needed anything, she could be reached at her cell phone number.  Tr. 68.

As to all three defendants, Agent Dudley testified that prior to their interviews, he informed each of them that they did not have to speak with him and asked each of them if they were willing to speak with him, he did not place anyone under arrest at the conclusion of the interviews, and he never handcuffed anyone.  Tr. 66-67.  Agent Dudley also testified that was aware that David had a degree from Iowa State University and was a Lieutenant Commander in the Navy, that none of the defendants had any criminal history, and that Tau and Fia had a brother who was a police officer in Honolulu.  Tr. 69.

In response to the Court's questioning, Agent Dudley stated that he did not provide the <u>Miranda</u> rights to defendants prior to interviewing them because they were not under arrest.  Tr. 113.

## II.    MOTIONS TO SUPPRESS EVIDENCE

Agent Geoffrey W. Stankevitz submitted five separate applications for search warrants for email accounts associated with defendants.  Gov't Exs. 1A, 2-4, 5A.  Each of these search warrants sought the identical computer files: all electronic mail contained in the email addresses or on behalf of the individuals for the email accounts; existing printouts of original email; transactional information associated with the email addresses, accounts or individuals, including user connection logs, connection information for other systems to which users connected, ports accessed, dial-up numbers accessed, purchases made, websites visited and services or information accessed through personalized home pages; all business records and subscriber information pertaining to the email address and to any email subscriber who sent a

message to or received a message from the email address, and any address books, buddy lists or other stored files or documents associated with the accounts. Id.

David and Fia maintained that all five warrants must be suppressed grounds that they lack sufficient facts to establish probable cause. Tau, on the other hand, objected to the warrants on grounds that they failed to describe the items to be seized with sufficient particularity. The Court first addresses the probable cause arguments by David and Fia and then examines Tau's challenge of particularity. The parties agreed that their respective motions can be resolved based on the four corners of the warrants and applications.

### A.     August 7, 2007 Warrants

The first two warrants in this case were submitted by Agent Stankevitz to and signed by the undersigned on August 7, 2007. Gov't Exs. 3 and 4. One warrant sought to search the email accounts of aeto.iseula@yahoo.com, fia.rosetter@yahoo.com, and tdawg05@yahoo.com as controlled by Yahoo! Inc. Gov't Ex. 3. The other warrant sought to search the email account of drosetter@gmail.com as controlled by Google Inc. Gov't Ex. 4. These two warrants attached identical affidavits setting forth the basis for the search warrants, which provided in pertinent part as follows:

BACKGROUND OF FRAUDULENT SCHEME

10. During the course of this investigation, agents have interviewed Richard Rosetter ("Richard"), his wife, Joan Rosetter (" Joan") and their daughter, Luann Rosetter ("Luann"). Through these interviews, agents have determined that in or about January 2005, Richard and Joan, both of Granite Falls, Minnesota, visited their son, David Rosetter ("David"), and his wife, Laumatafiafia Rosetter ("Fia"), at their home in San Diego, California, for several weeks. During their visit, Richard and Joan were introduced to "Tau" (last name unknown), who was introduced as Fia's sister and who had come to live with David and Fia after she divorced her husband. David, Fia, and Tau told Richard and Joan that employees of

Wal-Mart were conducting surveillance on everyone in the family. They said that Wal-Mart was trying to avoid paying a workers compensation claim to Tau, who had allegedly injured her foot while working for Wal-Mart.

11. In September 2005, Luann, who lived in Rapid City, South Dakota, received a telephone call from David. During the conversation, David told Luann that Wal-Mart employees wanted to kill him and their parents because he had helped Tau take Wal-Mart to court over the failure to pay a workers compensation benefit. David said that Tau had been working at Wal-Mart and had broken her foot after falling off a ladder. David said that Tau had been overworked, would be on disability for the rest of her life, and that Wal-Mart would rather kill her than pay the claim. David told Luann that she should "watch her back," because she was also in danger. He told her that she should check the brake lines on her pickup truck to be sure that Wal-Mart employees had not cut them.

12. In November 2005, David, Fia, and Tau visited Luann's home in Rapid City. They convinced her that "hit men" had been hired by Wal-Mart to kill the entire family. They also said that, because Tau and Fia were American Samoans, the Samoan Mafia was secretly following the family in order to protect them from the hit men. They said the Samoan Mafia was headed up by a person named "Uncle Mo."

13. During their visit, David and Fia placed a telephone call to Richard and Joan at their home in Granite Falls and told them that they were in grave danger from Wal-Mart hit men. They instructed them to leave their farm in Minnesota at once and travel to Luann's home in Rapid City. David and Fia told them that they had only 20 minutes or they would be killed. Richard and Joan immediately packed their bags and drove to Rapid City. When they arrived at Luann's home, David and Fia told them that "Uncle Mo" had said that they barely escaped with their lives and that the Samoan Mafia killed two Wal-Mart hit men. For the next week, David, Fia and Tau kept Richard, Joan and Luann constantly on the move in Rapid City traveling from different meeting spots and hotels ostensibly to evade the Wal-Mart hit men who were allegedly closing in on them.

14. After the visit in November 2005, and for the next year, David, Fia, and Tau continued to perpetuate the story of the WalMart hit men, "Uncle Mo," and his Samoan Mafia protectors. During this time, they told Luann to leave Rapid City, quit her job, change her name, get rid of her dog, and buy a new car. They told Richard and Joan to replace their car and motor home and change their physical appearances. They were repeatedly told by David, Fia, and Tau that Wal-Mart hit men were trying to kill them and that they should avoid being seen in public. During this time, Luann lived

with her parents in secret and hid under blankets in the car when Richard and Joan drove on and off of the property.

15. In January 2006, David called Luann and told her that she could sell her house in Rapid City, but that she would only be able to take a few belongings because the Samoan Mafia could only protect her for 30 minutes. Luann and Richard then drove to Rapid City and filled Luann's car with a few trash bags full of belongings before they returned to Minnesota. Luann then sold her house, and all the property inside it, for pennies on the dollar.

16. In January 2007, David made numerous phone calls to Richard, Joan and Luann. During these calls, David demanded money and repeatedly mentioned that he had made some sort of mistake, that his life was being threatened, and that the only way out was "6 feet under." David told Richard, Joan and Luann not to ask any questions and that if they did not send him the money, he and the Rosetter family would be killed. During the month, Richard, Joan and Luann wired a total of $7,147 to David.

17. From January 2007 through June 2007, Fia called Richard, Joan and Luann on numerous occasions and explained that David had embarrassed her family and that "Uncle Mo" was angry and would kill David as well as Richard, Joan, and Luann if money was not paid to Fia to cover the alleged debt that David had incurred.

USE OF E-MAIL ACCOUNTS TO EFFECT THE FRAUDULENT SCHEME

18. On or about April 23, 2007, Tau called Luann and asked for her e-mail address. Tau told her that she had a lot to update Luann and her parents about and said that it would be easiest to do so in an e-mail message.

19. On April 23, 2007, Luann received an e-mail purportedly from Tau from tdawg05@yahoo.com. (I have reviewed a copy of this e-mail as well as the other e-mails referenced below.) Luann wrote that "Uncle Mo" and the Samoan Mafia had discovered that David had an affair with an exotic dancer and, as a result, had a child out of wedlock. She also wrote that David had left Fia to be with the dancer and had amassed a huge amount of credit card debt. Because of this embarrassment, the Samoan Mafia was extremely angry with David and determined that he and his family would be held responsible. Tau wrote that "Uncle Mo" and the Samoan Mafia had given David instructions to repay his debt to the family and that "IF David does not follow "Uncle Mo's" instructions THEN him and his family (you and your parents) will suffer the consequences-' swimming with the fishes' . " (The capital lettering appeared in the original as with the other e-mails referenced below. ) The family was given a deadline of April 23, 2007, at 10:30 a.m. to payoff the credit card debt. If the credit card

was not paid off, "HE AND HIS FAMILY (YOU AND YOUR PARENTS) WILL BE 'DEALT WITH IMMEDIATELY'."

20. On April 25, 2007, Richard and Luann received an e-mail purportedly from Fia from fia.rosetter@yahoo.com. Fia wrote that David had left her with a huge amount of debt and was afraid to tell "Uncle Mo" about it.

21. On April 28, 2007, Richard and Luann received an e-mail purportedly from Fia from fia.rosetter@yahoo.com. The e-mail stated she had been embarrassed and left in financial ruin because David had left her for another woman. She asked Richard and Luann to send her money.

22. On May 18, 2007, Luann received an e-mail purportedly from "Uncle Mo" from aeto.iseula@yahoo.com. When referring to David, "Uncle Mo" stated that the Samoan Mafia had come to the conclusion that they must "'FINISH HIM OFF' COMPLETELY. HENCE IT MEANS SLEEPING WITH THE FISHES." The e-mail goes on "UNFORTUNATELY IT LOOKS VERY GRIM FOR ALL OF YOU TOO. WHY? BECAUSE HIS FATE IS ALSO YOUR FATE. YES, DAVID IS WELL AWARE THAT WHATEVER HE DOES WILL HAVE CONSEQUENCES UPON HIMSELF. AS WELL AS ALL OF YOU (GRAMPS, GRANDMA AND SWEEPY)." (Investigation reveals that these nicknames relate to Richard, Joan and Luann, respectively.) The e-mail concluded by demanding $164,000 to cover the debt allegedly incurred by David.

23. On May 18, 2007, Luann received another e-mail purportedly from "Uncle Mo" from aeto.iseula@yahoo.com. In the email, "Uncle Mo" instructed Luann and Richard to contact David using drosetter@gmail.com in order to hear directly from David about the trouble he had caused. The e-mail reiterated the deadline to gather the money or they would "IMMEDIATELY FINISH HIM OFF NOW. AN EYE FOR AN EYE'"

24. On May 18, 2007, Luann sent an e-mail to drosetter@gmail.com asking David to explain himself. Shortly thereafter, Luann received a response purportedly from David from drosetter@gmail. com stating: "OH SHIT! Big Mo was not bluffing at all." Luann replied and expressed concern for David's safety. Shortly thereafter, Luann received another e-mail from drosetter@gmail.com stating: "Why should I do what Big Mo tells me?! I'm in love with my Chamorro (Guam) girlfriend and we have a daughter together." The e-mail also contained a photograph depicting a scantily dressed woman exposing her breasts.

25. On May 21, 2007, Luann received another e-mail purportedly from "Uncle Mo" from aeto.iseula@yahoo.com which demanded an additional $120,000 to payoff a condominium which would save the lives of Richard, Joan, Luann and David.

26. On May 27, 2007, Luann received another e-mail purportedly from "Uncle Mo" from aeto.iseula@yahoo.com demanding that all money they required from Richard, Joan and Luann be paid immediately. The e-mail stated that "DAVID'S DEBTS HAVE TO PAID NOW" and "YOUR OPTIONS ARE GETTING SLIMMER AND SLIMMER AT THIS POINT. YES EITHER DO OR DIE FOR ALL OF YOU!"

27. From May 27, 2007, until June 22, 2007, Luann received numerous other e-mails purportedly from "Uncle Mo" from aeto.iseula@yahoo.com. In these e-mails, "Uncle Mo" made repeated threats against the lives of Richard, Joan and Luann and demanded money.

28. On May 28, 2007, Luann received an e-mail purportedly from Fia from fia.rosetter@yahoo. com. The e-mail stated that "Uncle Mo is not happy at all!" and that more money was needed to payoff her bills to satisfy him.

29. On June 22, 2007, Luann received an e-mail purportedly from David from drosetter@gmail.com stating "Yes, I fucked up and I am paying the price for it" and "I seriously cannot believe you would question Uncle Mo and his sons."

30. From January 2007 through June 5, 2007, Richard, Joan and Luann wired a total of $185,000 in pay-offs to David and Fia for moneys purportedly demanded by "Uncle Mo" and the Samoan Mafia.

31. In July 2007, I obtained subscriber and IP connection information from Yahoo and Google for e-mail accounts aeto.iseula@yahoo.com, fia.rosetter@yahoo.com, tdawg05@yahoo.com and drosetter@gmail.com. This information revealed the following:

   a. The registered name associated with aeto.iseula@yahoo.com is "Ms Fia R." The alternate e-mail address provided for the account is laumatafiafia@gmail.com. The IP connection logs for aeto. iseula@yahoo. com from May 2007 through June 2007 list IP addresses 68.115.189.25 and 68.119.168.53. Through investigation, I have discovered that an individual with IP address 68.119.168.53 has accessed all of the accounts and that this IP address belongs to "David R. Rosetter."

   b. The registered name associated with fia.rosetter@yahoo.com is "Mrs. Laumatafiafia Rosetter." The IP connection logs for fia.rosetter@yahoo.com from May 2007 through June 2007 list the same two IP addresses that connected to aeto.iseula@yahoo.com, namely 68.115.189.25 and 68.119.168.53.

c. The registered name associated with tdawg05@yahoo. com is "Ms T DAWG." The alternate email address provided for the account is laumatafiafia@hotmail.com. The majority of the connections to the account were from IP address 68.119.168.53.

d. The registered name associated with drosetter@gmai1.com is "David Rosetter." The IP connection logs for drosetter@gmai1.com from May 2007 through June 2007 list the same two IP addresses that connected to aeto.iseu1a@yahoo.com and fia.rosetter@yahoo.com, namely 68.115.189.25 and 68.119.168.53.

32. Based on the foregoing, there is probable cause to believe that David Rosetter, Laumatafiafia Rosetter and Tau (last name unknown) unlawfully, knowingly and intentionally devised a scheme and artifice to defraud and then transmitted by means of wire in interstate commerce writings for the purpose of executing such scheme and artifice in violation of 18 U.S.C. § 1343.

33. Based on the foregoing, there is probable cause to believe that in the computers, records and documents owned, maintained, and operated by Yahoo and Google, there exists evidence of the commission of the above-described offense, contraband, the fruits of crime, property designed or intended for use and which is and has been used as the means of committing the offense, and more particularly described in Attachment A (Yahoo) and Attachment B (Google).

Gov't. Exs. 3 and 4.

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit. Illinois v. Gates, 462 U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit… including the 'veracity' and 'basis of knowledge' of persons supplying hearsay

information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. In reviewing this decision of the issuing court, the duty of the reviewing court is simply to ensure that the court had a substantial basis for concluding that probable cause existed. Id. at 238-39 (citation omitted); see also United States v. LaMorie, 100 F.3d 547, 552 (8th Cir. 1996) (citation omitted) ("Our duty as the reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the determination of probable cause by the issuing judge."). As to what this Court should consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge] relied solely on the affidavit presented to him, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (citing United States v Etheridge, 165 F.3d 655, 656 (8th Cir. 1999), quoting United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995)).

David and Fia submitted virtually identical arguments, arguing that the affidavits accompanying the warrants signed on August 7, 2007, conclude that there was a scheme, that the victims were duped, and that defendants propagated a story, without offering any facts to support the finding that the statements made by defendants were false, or that the Samoan Mafia was not conducting surveillance of the Rosetters, or that they were not truly in danger. David's Mem., p. 3 [Docket No. 88]; Fia's Mem., pp. 6-7 [Docket No. 87]. Additionally, both defendants argued that the affidavits accompanying these warrants make the bald assertion of a "fraudulent scheme," without any facts to support this assertion. David's Mem., pp. 3-4; Fia's Mem., pp. 7-8

On this basis, both David and Fia maintained that there was no probable cause due to the lack of factual detail to support these conclusions. Id.

The Court finds David and Fia's arguments unavailing. Here, the affidavit set out that agents had interviewed all three victims to an alleged crime – David's parents, Richard and Joan, and David's sister, Luann – and obtained from them information that during the time period from 2005 through 2007 they had been told that by defendants that hitmen were trying to kill them, they were being protected by the Samoan Mafia and Uncle Mo, and that at some point, Uncle Mo and the Samoan Mafia became angry with David and repeatedly threatened to kill David and the Rosetters if the Rosetters failed to pay money to Uncle Mo, pay off David's debts or send money to Fia. In support of their story, the Rosetters provided to the agents emails that both Luann and Richard had received from the defendants which described David's affair with the exotic dancer, David's huge debt, threats to kill David and demands for money to cover David's debts, a credit card debt, the payment for a condominium and Fia's bills. The affiant to the warrants, Agent Stankevitz, reviewed these emails and described their contents in his affidavit. His independent review and description of the contents of the emails, the wire transfers of money to David and Fia, and the facts to establish that these emails were associated with David, Fia and Tau, provided this Court with sufficient information from which it could reasonably conclude that there was evidence of a crime – i.e. a scheme and artifice to defraud via wire transfer – within the email accounts of aeto.iseula@yahoo.com, fia.rosetter@yahoo.com, tdawg05@yahoo.com, and drosetter@gmail.com.

David and Fia's argument that the search warrants must be suppressed because there were no facts in them to support a finding that the alleged statements by defendants to the victims were false, misses the mark. Even if the alleged statements made by defendants as asserted in the warrant applications ultimately were determined to be true (e.g. there was an "Uncle Mo" or hit men had been hired by Wal-Mart to kill the family or the Samoan Mafia was actually watching and protecting the Rosetters), the fact remains that the Rosetters were paying hundreds of thousands of dollars under threat of harm and death and the situation required investigation by law enforcement. Most warrants are sought with the objective to investigate complaints of a crime. Here, the Rosetters were wiring money because they feared for their lives if they did not do so, and the reason for wiring that money was the alleged statements of defendants made in person, over the phone and via email to get the money. The purpose of the warrants was to investigate whether a crime was being perpetrated on the victims, and included obtaining information to determine if the statements of defendants were true or not. It was not necessary for Agent Stankevitz to corroborate that the defendants' alleged statements were lies in order to substantiate probable cause to issue the warrant.

Based upon the totality of the circumstances, the Court finds that substantial evidence existed to support the finding of probable cause to issue the search warrants for the email addresses.

**B.    September 19, 2007 Warrant**

On September 19, 2007, Agent Stankevitz applied for a search warrant for the email account mnpalagi@yahoo.com, controlled by Yahoo! Inc. That warrant was

signed by United States Magistrate Judge Arthur J. Boylan.  Gov't Ex. 2.  The affidavit

attached to the warrant provided in pertinent part as follows:

> 10. During the course of this investigation, the FBI has learned that Richard Rosetter ("Richard"), his wife, Joan Rosetter ("Joan"), their daughter, Luann Rosetter ("Luann"), and their son, David Rosetter ("David"), were duped into believing that members of the "Samoan Mafia" were conducting surveillance of their family and that the entire family was in great danger.

> 11. Investigation has revealed that this story was propagated by David's wife, Laumatafiafia Rosetter ("Fia"), Fia's sister, "Tau" (last name unknown) and unwittingly by David, for the purpose of defrauding the family of approximately $185,000 in United States currency.

> 12. During an interview of Richard, Joan and Luann on June 14, 2007, Luann told the FBI that in September 2005, she received a telephone call from David while she was living in Rapid City, South Dakota. During the conversation, David told Luann that WalMart employees wanted to kill him and their parents because he had helped Tau take Wal-Mart to court over the failure to pay a workers compensation benefit. David said that Tau had been working at WalMart and had broken her foot after falling off a ladder. David said that Tau had been overworked, would be on disability for the rest of her life, and that Wal-Mart would rather kill her than pay the claim. David told Luann that she should "watch her back," because she was also in danger. He told her that she should check the brake lines on her pickup truck to be sure that Wal-Mart employees had not cut them.

> 13. During the same interview, Luann told the FBI that in November 2005, David, Fia and Tau visited Luann's home in Rapid City. They convinced her that "hit men" had been hired by Wal-Mart to kill the entire family. They also said that, because Tau and Fia were American Samoans, the Samoan Mafia was secretly following the family in order to protect them from the hit men. They said the Samoan Mafia was headed up by a person named "Uncle Mo."

> 14. During the same interview, Luann, Richard and Joan told the FBI that when David, Fia and Tau visited Luann in November 2005, David and Fia placed a telephone call to Richard and Joan at their home in Granite Falls and told them that they were in grave danger from Wal-Mart hit men. David and Fia instructed Richard and Joan to leave their farm in Minnesota at once and travel to Luann's home in Rapid City. David and Fia told them that they had only 20 minutes to leave, or they would be killed. Richard and Joan immediately packed their bags and drove to Rapid City. When they arrived at Luann's home, David and Fia told them

that "Uncle Mo" had said that they barely escaped with their lives and that the Samoan Mafia killed two Wal-Mart hit men. For the next week, David, Fia and Tau kept Richard, Joan and Luann constantly on the move in Rapid City traveling from different meeting spots and hotels ostensibly to evade the Wal-Mart hit men who were allegedly closing in on them.

15. During the same interview, Richard, Joan and Luann told the FBI that after the visit in November 2005, and for the next year, David, Fia and Tau perpetuated the story of the Wal-Mart hit men, "Uncle Mo," and his Samoan Mafia protectors. They told Luann to leave Rapid City, quit her job, change her name, get rid of her dog, and buy a new car. They told Richard and Joan to replace their car and motor home and change their physical appearances. David, Fia and Tau repeatedly told them that Wal-Mart hit men were trying to kill them and that they should avoid being seen in public. Luann said that during this time, she lived with her parents in secret and hid under blankets in the car when Richard and Joan drove on and off of the property.

16. During the same interview, Luann told the FBI that in January 2006 David called her when she was living with Richard and Joan and told her that it would be alright for her to sell her house in Rapid City. He told her that she would only be able to take a few belongings and that the Samoan Mafia could only protect her for 30 minutes. Luann and Richard said that they drove to Rapid City and filled Luann's car with a few trash bags full of belongings. Luann said that she then sold her house and all the property inside of it.

17. During the same interview, Richard, Joan and Luann told the FBI that in January 2007 David made numerous phone calls to them. During these calls, David demanded money and repeatedly mentioned that he had made some sort of mistake, that his life was being threatened, and that the only way out was "6 feet under." David told them not to ask any questions and that if they did not send him the money, he and the Rosetter family would be killed. During the month, Richard, Joan and Luann wired a total of $7,147 to David. Luann provided the FBI with original Western Union receipts which documented these wire transfers.

18. During the same interview, Richard, Joan and Luann told the FBI that from January 2007 through June 2007, Fia called them on numerous occasions and explained that David had embarrassed her family and that "Uncle Mo" was angry and would kill David as well as them if money was not paid to Fia to cover the alleged debt that David had incurred.

USE OF E-MAIL ACCOUNTS TO EFFECT THE FRAUDULENT SCHEME

19. During the same interview, Luann told the FBI that on or about April 23, 2007, Tau called her and asked for her e-mail address. Tau also told her that Tau had a lot to update Luann and her parents about and said that it would be easiest to do so in an e-mail message.

20. I have reviewed an e-mail message to Luann on April 23, 2007, that was purportedly sent from Tau from e-mail address tdawg05@yahoo.com. (Richard and Luann provided the FBI with their personal e-mail records.) Tau wrote that "Uncle Mo" and the Samoan Mafia had discovered that David had an affair with an exotic dancer and, as a result, had a child out of wedlock. She also wrote that David had left Fia to be with the dancer and had amassed a huge amount of credit card debt. Because of this embarrassment, the Samoan Mafia was extremely angry with David and determined that he and his family would be held responsible. Tau wrote that "Uncle Mo" and the Samoan Mafia had given David instructions to repay his debt to the family and that "IF David does not follow "Uncle Mo's" instructions THEN him and his family (you and your parents) will suffer the consequences-' swimming with the fishes'." (The capital lettering appeared in the original as with the other emails referenced below.) The family was given a deadline of April 23, 2007, at 10:30 a.m., to payoff the credit card debt. The email went on to say that if the credit card was not paid off, "HE AND HIS FAMILY (YOU AND YOUR PARENTS) WILL BE 'DEALT WITH IMMEDIATELY.'. "

21. I have reviewed another e-mail message that was addressed to both Richard and Luann on April 25, 2007, that was purportedly sent from Fia from fia.rosetter@yahoo.com. Fia wrote that David had left her with a huge amount of debt and was afraid to tell "Uncle Mo" about it.

22. I have reviewed another e-mail message to both Richard and Luann on April 28, 2007, that was purportedly sent from Fia from fia.rosetter@yahoo.com. The e-mail stated she had been embarrassed and left in financial ruins because David had left her for another woman. She asked Richard and Luann to send her money.

23. I have reviewed another e-mail message to Luann on May 18, 2007, that was purportedly sent from "Uncle Mo" from aeto.iseula@yahoo.com. When referring to David, "Uncle Mo" stated that the Samoan Mafia had come to the conclusion that they must "'FINISH HIM OFF' COMPLETELY. HENCE IT MEANS SLEEPING WITH THE FISHES." The e-mail goes on to say: "UNFORTUNATELY IT LOOKS VERY GRIM FOR ALL OF YOU TOO. WHY? BECAUSE HIS FATE IS ALSO YOUR FATE. YES, DAVID IS WELL AWARE THAT WHATEVER HE DOES WILL HAVE CONSEQUENCES UPON HIMSELF. AS WELL AS ALL OF YOU (GRAMPS, GRANDMA AND SWEEPY)." (Investigation reveals that these nicknames relate to Richard, Joan and Luann, respectively.) The e-mail

concluded by demanding $164,000 to cover the debt allegedly incurred by David.

24. I have reviewed another e-mail message to Luann on May 18, 2007, that was purportedly sent from "Uncle Mo" from aeto.iseula@yahoo.com. In the e-mail, "Uncle Mo" instructed Luann and Richard to contact David using drosetter@gmail.com in order to hear directly from David about the trouble he had caused. The email reiterated the deadline to gather the money or they would "IMMEDIATELY FINISH HIM OFF NOW. AN EYE FOR AN EYE!"

25. During the interview on June 14, 2007, Luann told the FBI that on May 18, 2007, she sent an e-mail todrosetter@gmail.com asking David to explain himself. Shortly thereafter, she received a response purportedly from David using drosetter@gmail.com stating: "OH SHIT! Big Mo was not bluffing at all." Luann replied and expressed concern for David's safety. Shortly thereafter, Luann received another e-mail from drosetter@gmail.com stating: "Why should I do what Big Mo tells me?! I'm in love with my Chamorro (Guam) girlfriend and we have a daughter together." The e-mail also contained a photograph depicting a scantily dressed woman exposing her breasts. (I have reviewed copies of these email messages.)

26. I have reviewed another e-mail message to Luann on May 21, 2007, purportedly from "Uncle Mo" sent from aeto.iseula@yahoo.com. The e-mail demanded an additional $120,000 to payoff a condominium which would "save the lives" of Richard, Joan, Luann and David.

27. I have reviewed another e-mail message sent to Luann on May 27, 2007, purportedly from "Uncle Mo" from aeto.iseula@yahoo.com demanding that all money they required from Richard, Joan and Luann be paid immediately. The e-mail stated that "DAVID'S DEBTS HAVE TO PAID NOW" and "YOUR OPTIONS ARE GETTING SLIMMER AND SLIMMER AT THIS POINT. YES EITHER DO OR DIE FOR ALL OF YOU!"

28. I have reviewed another e-mail message to Luann on May 28, 2007, purportedly sent from Fia from fia.rosetter@yahoo.com. The e-mail stated that "Uncle Mo is not happy at all!" and that more money was needed to payoff her bills to satisfy him.

29. I have reviewed numerous other e-mail messages to Luann from May 28, 2007, to June 22, 2007, purportedly sent from "Uncle Mo" from aeto.iseula@yahoo.com. In these e-mails, "Uncle Mo" made repeated threats against the lives of Richard, Joan and Luann and demanded money.

30. I have reviewed another e-mail message to Luann on June 22, 2007, purportedly sent from David from drosetter@gmail.com stating: "Yes, I fucked up and I am paying the price for it" I seriously cannot believe you would question Uncle Mo and his sons."

31. On June 22, 2007, the FBI reviewed a number of financial records supplied by Richard, Joan and Luann. These records consist of receipts of wire transfers from Western Union and copies of bank account statements. These records reflect that from January 2007 through June 5, 2007, Richard, Joan and Luann wired a total of $185,000 to David and Fia. They stated that this money was sent as "pay-offs" for money demanded by "uncle Mo" and the Samoan Mafia.

32. In July 2007, the FBI obtained subscriber and IP connection information from Yahoo and Google for e-mail accounts aeto.iseula@yahoo.com, fia.rosetter@yahoo.com, tdawg05@yahoo.com and drosetter@gmail.com. This information revealed the following:

a. The name associated with aeto.iseula@yahoo.com is "Ms. Fia R." The alternate email address provided for the account is laumatafiafia@gmail.com. The IP connection logs for aeto.iseula@yahoo.com from May 2007 through June 2007 list IP addresses 68.115.189.25 and 68.119.168.53. Through investigation, I have discovered that an individual with IP address 68.119.168.53 has accessed all of the accounts and that this IP address belongs to "David R. Rosetter."

b. The name associated with fia.rosetter@yahoo.com is "Mrs. Laumatafiafia Rosetter." The IP connection logs for fia.rosetter@yahoo.com from May 2007 through June 2007 list the same two IP addresses that connected to aeto.iseula@yahoo.com, namely 68.115.189.25 and 68.119.168.53.

c. The name associated with tdawg05@yahoo.com is "Ms T DAWG." The alternate email address provided for the account is laumatafiafia@hotmail.com. The majority of the connections to the account were from IP address 68.119.168.53.

d. The name associated with drosetter@gmail.com is "David Rosetter." The IP connection logs for drosetter@gmail.com from May 2007 through June 2007 list the same two IP addresses that connected to aeto.iseula@yuahoo.com and fia.rosetter@yahoo.com, namely 68.115.189.25 and 68.119.168.53.

33. On August 7, 2007, the Honorable Janie S. Mayeron, United States Magistrate Judge, issued search warrants for information pertaining to the above-described e-mail accounts. Thereafter, the FBI obtained records for these accounts. For e-mail account aeto.iseula@yahoo.com, the FBI found an e-mail attachment with a letter attachment addressed to David, dated January 20, 2007. In the letter, which is signed by "Papa Mo," "Papa T," "Tony" and the "OSO," it states: "YOUR FAMILY HAVE ALWAYS BEEN UNDER SURVEILLANCE SINCE YOU WERE STATIONED AT 32ND STREET IN SAN DIEGO!....IT DOES NOT MAKE A DIFFERENCE THAT YOU ARE NOT IN THE CONTINTENTAL UNITED STATES. BECAUSE I HAVE 'EYES AND EARS' EVERYWHERE YOU WILL BE!" The message directs David to use e-mail address mnpalagi@yahoo.com to send e-mail messages to "Uncle Mo" and the other Samoan Mafia members, because it is "more secure." The FBI has reviewed other e-mails from these accounts which reflect that David was likely an unwitting accomplice to the fraudulent scheme and was also duped into believing the representations made by Fia and Tau.

34. Based on the foregoing, there is probable cause to believe that Laumatafiafia Rosetter and Tau (last name unknown) unlawfully, knowingly and intentionally devised a scheme and artifice to defraud and then transmitted by means of wire in interstate commerce writings for the purpose of executing such scheme and artifice in violation of 18 U.S.C. 1343.

35. Based on the foregoing, there is probable cause to believe that in the computers, records and documents owned, maintained, and operated by Yahoo, there exists evidence of the commission of the above-described offense, contraband, the fruits of crime, property designed or intended for use and which is and has been used as the means of committing the offense, and more particularly described in Attachment A.

Gov't Ex. 2.

With regard to the September 19, 2007 warrant for mnpalagi@yahoo.com, David and Fia both challenged the warrant on the same basis as they had argued with respect to the August 7, 2007 warrants – i.e. the warrant made bald assertions of various false statements and illegal activities without any factual basis. David's Mem., p. 3; Fia's Mem., p. 7. Additionally, both defendants argued that the warrant was deficient because there was no probable cause to believe that contraband or evidence of a crime

would be found in the mnpalagi@yahoo.com account.  David's Mem., p. 4; Fia's Mem., p. 8.

Defendants' arguments are rejected.  The victims' story of extortion and fraud was corroborated not only by the very same emails and facts discussed above in connection with the August 7, 2007 warrants, but the affiant described two additional emails he had obtained and reviewed to support their claims: an email dated June 22, 2007 from David to Luann, and the email from the aeto.iseula@yahoo.com account which attached a letter addressed to David signed by "Papa Mo," "Papa T," "Tony" and the "OSO," confirming the surveillance of David's family and directing David to use the e-mail address mnpalagi@yahoo.com to send e-mail messages to "Uncle Mo" and the other Samoan Mafia members.  Gov't Ex. 2, ¶¶ 30, 33.

Further, the affidavit contained a description of records reviewed by agents establishing that Richard, Joan and Luann had wired $185,000 to David and Fia, again corroborating the information the victims had provided in their interview with agents regarding the payments to David and Fia as payoffs in response to the threats.  Gov't Ex. 2, ¶¶ 17, 31.

All of these facts, along with the letter attached to the January 20, 2007 email from the aeto.iseula@yahoo.com account to David, supported the request for a search of the mnpalagi@yahoo.com account.  The email account aeto.iseula@yahoo.com had already been determined to be associated the other email accounts of fia.rosetter@yahoo.com, tdawg05@yahoo.com, and drosetter@gmail.com, all of which had contained other allegedly illegal emails that had been sent to the Rosetters.  Further, this attachment, like other emails, both threatened David and instructed him to

use mnpalagi@yahoo.com account for future email messages to Uncle MO and other Samoan Mafia members. Based upon the totality of the circumstances, the Court finds that substantial evidence existed to support the finding of probable cause to issue the search warrant for mnpalagi@yahoo.com.

### C. June 26, 2008 Warrants

Agent Stankevitz applied for two more search warrants on June 26, 2008, one for the email account of aeto.iseula@yahoo.com, controlled by Yahoo! Inc., and the other for the email account of paythepiper@live.com, controlled by Microsoft Online Services. The warrants were signed by the undersigned. Gov't Exs. 1A and 5A. The affidavit accompanying those warrants was identical to the affidavit for the September 19, 2007 warrant for mnpalagi@yahoo.com until Paragraph 31, at which point it substituted the following information that Agent Stankevitz had obtained since executing the earlier warrants:

> 31. I have reviewed an e-mail message to Luann and Richard on April 10, 2008, purportedly sent from "Big Mo" from aeto.iseula@yahoo.com stating "I DO NOT CARE IF YOU EITHER DISOWNED OR DO NOT RECOGNIZED DAVID AS YOUR SON ANYMORE. THAT IS NOT MY PROBLEM! HE IS STILL YOUR SON IN OUR EYES! I TOOK CARE OF HIS FINANCIAL OBLIGATIONS AND DEBTS, ETC. WHETHER YOU LIKE IT OR NOT YOU OWE ME. IT IS ALL IN THE PRINCIPAL! DO NOT FORGET THAT ACCIDENTS DO HAPPEN WHEN ONE LEAST EXPECTED! ONE SHOULD BE CAREFUL NOT TO CROSS ME."

> 32. I have reviewed an e-mail message to Richard on April 28, 2008, purportedly sent from "Papa Mo" from paythepiper@live. Com stating, "WHY ARE YOU STALLING? WERE YOU NOT SPECIFICALLY TOLD TO DEAL DIRECTLY WITH ME?" and "IF UNFORTUNATE EVENTS START HAPPENINGTHEN IT IS BECAUSE YOU DID NOT REPLY TO THIS EMAIL!"

> 33. I have reviewed an e-mail message to Richard on April 29, 2008, purportedly sent from "Papa Mo" from paythepiper@live.com stating, "IT LOOKS LIKE YOU ARE HOLDING BACK ON ME. IS THERE A

PROBLEM?" and "DO NOT FORGET TO LOOK OVER YOUR SHOULDER AT ALL TIMES-YOU NEVER KNOW WHO WILL STOP BY THE HOUSE," and informing Richard that contractors from South Dakota had located Luann, were furious with her, and she was again in danger from them.

34. I have reviewed an e-mail message to Richard and Luann on May 1, 2008, purportedly sent from "Papa Mo" from paythepiper@live.com stating, "YOU WILL BE WAKING UP AND GOING TO BED IN FEAR!" and "DUE TO THE FACT THAT YOU REFUSE TO RESPOND TO ME THEN I WILL BE A FIXTURE OF YOUR LIVES!"

35. I have reviewed an e-mail message to Richard and Luann on May 2, 2008, purportedly sent from "Papa Mo" from paythepiper@live.com stating, "I HEAR AND SEE EVERYTHING THAT GOES ON IN YOUR HOUSE!" and "IT IS DONE! I LOOK FORWARD TO MEETING UP WITH YOU ALL IN PERSON!" and "EXPECT THE UNEXPECTED FROM NOW ON - I AM ON MY WAY TO FELLOWSHIP WITH YOU!"

36. I have reviewed several other e-mail messages to Luann and Richard between May 2, 2008 and May 7, 2008, purportedly from "Papa Mo" from the email address paythepiper@live.com. In each message, the sender continually harasses, threatens, and implies danger to Richard, Luann, and Joan unless they pay $360,000.

36. (sic) A review of subscriber and customer information for the above-referenced e-mail accounts obtained through court-ordered search warrants and independent investigation links them all to the Rosetters.

37. Based on the foregoing, there is believe that Laumatafiafia Rosetter and Tau (last name unknown) unlawfully, knowingly and intentionally devised a scheme and artifice to defraud and then transmitted by means of wire in interstate commerce writings for the purpose of executing such scheme and artifice in violation of 18 U.S.C. § 1343.

38. Based on the foregoing, there is probable cause to believe that in the computers, records and documents owned, maintained, and operated by Yahoo and Microsoft, there exists evidence of the commission of the above-described offense, contraband, the fruits of crime, property designed or intended for use and which is and has been used as the means of committing the offense, and more particularly described in Attachments A and B.

Gov't Exs. 1A and 5A.

David and Fia challenged the June 26, 2008 warrants on the same grounds as the other warrants – they claimed the warrants were unsupported by probable cause because they offered no facts in support the conclusions set forth in the affidavit.[3] David's Mem., p. 3; Fia's Mem., p. 7.

Again, the Court finds that the affidavits set forth facts indicating that the safety of the Rosetters was under threat if the Rosetters failed to pay money to Uncle Mo, David and Fia and that the additional emails from aeto.iseula@yahoo.com and paythepiper@live.com corroborated the facts provided by the victims of the alleged scheme up through the date of the applications for the search warrants. Additionally, new facts indicated that not only were there emails demanding money and threatening harm via aeto.iseula@yahoo.com from January 2007 through April, 2008, but they were now coming from another email account, paythepiper@live.com.

Based upon the totality of the circumstances, the Court finds that substantial evidence existed to support the finding of probable cause to issue the search warrants for the email addresses aeto.iseula@yahoo.com and paythepiper@live.com.

**D.    Particularity**

Each of the search warrants sought: all electronic mail contained in the email addresses or on behalf of the individuals for the email accounts; existing printouts of

---

[3]    David and Fia also contended that the warrant for aeto.iseula@yahoo.com (Gov't Ex. 1A) must be suppressed because although the warrant was issued at 2:10 p.m. on June 26, 2008, the affidavit was not signed until two days later, on June 28, 2008. David's Mem., p. 4; Fia's Mem., p. 8. After researching its calendar, the undersigned discovered that it made an error in dating the signature of the affidavit. The undersigned was assigned to criminal duties on Thursday, June 26, 2008. On June 28, 2008, a Saturday, the undersigned was out of town and the Magistrate Judge on duty for criminal matters was Magistrate Judge Jeffrey Keyes. Exhibit 1A and Exhibit 5A were signed by the undersigned at the same date and time, June 26, 2008 at 2:10 p.m.

original email; transactional information associated with the email addresses, accounts or individuals, including user connection logs, connection information for other systems to which users connected, ports accessed, dial-up numbers accessed, purchases made, websites visited and services or information accessed through personalized home pages; all business records and subscriber information pertaining to the email address and to any email subscriber who sent a message to or received a message from the email address, and any address books, buddy lists or other stored files or documents associated with the accounts.  Gov't Exs. 1A, 2-4, 5A.

Tau argued that all five warrants failed to describe the items to be seized with particularity, and accordingly, there was no showing of probable cause that all of the records sought by the warrants were likely to evidence criminal activity.  Tau's Mem., pp. 18-19 [Docket No. 86].

"To satisfy the particularity requirement of the Fourth Amendment, the items to be seized and the places to be searched must be described with sufficient particularity as to enable the searcher to locate and identify the places and items with reasonable effort and to avoid mistakenly searching the wrong places or seizing the wrong items." United States v. Gleich, 397 F.3d 608, 611 (8th Cir. 2005) (citations omitted).  "The degree of specificity required will depend on the circumstances of the case and on the type of items involved."  United States v. Horn, 187 F.3d 781, 788 (8th Cir. 1999).  The particularity requirement "is a standard of 'practical accuracy' rather than a hypertechnical one."  United States v. Peters, 92 F.3d 768, 769-70 (8th Cir. 1996) (quoting United States v. Lowe, 50 F.3d 604, 607 (8th Cir.), cert. denied, 516 U.S. 900, 116 S.Ct. 260, 133 L.Ed.2d 183 (1995)).  See also United States v. Jansen, 470 F.3d

762, 766 (8th Cir. 2006) ("The standard used to determine whether a warrant description is sufficiently specific is one of 'practical accuracy,' and the degree of specificity may change according to circumstances.") (quoting United States v. Porter, 831 F.2d 760, 764 (8th Cir. 1987)).

The Court finds the list of records to be seized attached to each of the five search warrants to be sufficiently particular and the facts stated in the affidavits supported the categories items to be searched and seized. Defendants were being investigated for fraud committed through the use of email. Agent Stankevitz's affidavit makes it clear that email was used to further the alleged fraud, and it was reasonable for the warrants to seek emails associated with the email addresses at issue on that basis, along with connection information to establish the location of the individuals logging on to those email addresses, subscriber information for senders and receivers to determine the scope of the alleged fraud and the identity of other individuals who may be involved in the fraud. The Court does not find that this was a generalized search, but rather concludes it was tailored to an alleged crime perpetrated through the use of electronic mail. In sum, the list was sufficiently particular to enable Yahoo!, and Google to "locate and identify the places and items with reasonable effort and to avoid mistakenly searching the wrong places or seizing the wrong items." Gleich, 397 F.3d at 611. Accordingly, the Court finds that the search warrants were sufficiently particular and recommends denial of Tau's motion to suppress evidence seized on the five search warrants on this basis.

**III. FIA'S MOTION TO SUPPRESS ALL ELECTRONIC SURVEILLANCE EVIDENCE AND ALL DISCLOSED ELECTRONIC COMMUNICATIONS AND ANY EVIDENCE DERIVED THEREFROM**

Fia's motion seeks to suppress electronic surveillance and all disclosed electronic communications "because the communications at issue were unlawfully intercepted or disclosed, and the orders of authorization or approval or disclosure pursuant to which the communications were intercepted or disclosed are statutorily insufficient. 18 U.S.C. §§ 2518(10)(a), 2515, and 2703." Fia's Electronic Suppression Motion, p. 1 [Docket No. 38]. The motion refers to "at least one intercepted telephonic communication and the disclosure of a voluminous quantity of other electronic communications." Fia did not submit a memorandum in support of this motion nor did she give the Court any clue as to which communications (telephonic or otherwise) she sought to suppress. At a minimum, it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed. See United States v. Starks, 193 F.R.D. 624, 629 (D. Minn. 2000) (quoting United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir.), cert. denied 431 U.S. 932 (1977) ("It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing.")). As the court in Starks observed, "even in those circumstances where the Government has the ultimate burden of persuasion, Defendant has the initial burden of making a prima facie showing of illegality." 193 F.R.D. at 629; see also United States v. Diezel, 608 F.2d 204, 207 (5th Cir. 1979) ("As this Court said in United States v. Evans, 572 F.2d 455, 486 (5th Cir. 1978), cert. denied 439 U.S. 870 (1978), 'The burden is on the movant to make specific factual allegations of illegality, to produce evidence, and to persuade the

court that the evidence should be suppressed.'"). Failure to provide the Court with any support for the motion is a sufficient basis for denial of the motion.

Nevertheless, even if the Court were to presume the intercepted telephonic communication refers to the tape-recording by Luann of the phone conversation between Fia and Luann referring to Papa Mo, obtained at the request of Agent Dudley on June 22, 2007, (Tr. 44, 83), or all the emails obtained via the five search warrants, Fia's motion would fail.

Title I of the Electronic Communications Privacy Act of 1986, Pub.L. No. 99-508, Title I, 100 Stat. 1851, regulates the interception of wire, oral and electronic communications. 18 U.S.C. § 2510-22 (2000).[4] Warrantless electronic surveillance will not violate the Act or the Fourth Amendment if the interceptor is a party to the conversation or one of the parties has given prior consent to the interception. See 18 U.S.C. § 2511(2)(c) ("[i]t shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception"). "Thus, when a law enforcement officer or government informant participates in a conversation and records the conversation without prior judicial authorization, the evidence is admissible." 36 Geo. L.J. Ann. Rev. Crim. Proc. (2007), p. 156, n. 467 (citations omitted). See also United States v. Corona-Chavez, 328 F.3d 974, 978-980 (8th Cir. 2003) (electronic evidence found admissible where informant consented to recording phone conversation and videotaping meeting with defendant). Here, Luann consented to taping the phone conversation with Fia.

---

[4] Title I amended Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90-351, 82 Stat. 212.

Consequently, if Fia was seeking by her motion to suppress the conversation, this motion should be denied.

As to the any emails obtained from Yahoo! or Google pursuant to the five search warrants, as this Court has determined that all five search warrants were proper, this Court finds no violation of 18 U.S.C.A. § 2703 governing disclosure of customer communications or records by a provider of electronic communication service pursuant to a valid warrant.

## IV.     MOTIONS TO SUPPRESS STATEMENTS

### A.     <u>Standard of Review</u>

<u>Miranda v. Arizona</u> requires that an individual be advised of her right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>see</u> <u>also</u> <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990). Therefore, the protections afforded by <u>Miranda</u> are triggered when an individual "is both in custody and being interrogated."  <u>United States v. Hatten</u>, 68 F.3d 257, 261 (8th Cir. 1995) (<u>citing</u> <u>United States v. Lawrence</u>, 952 F.2d 1034, 1036 (8th Cir.), <u>cert.</u> <u>denied</u>, 503 U.S. 1011 (1992)).  "Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way."  <u>Miranda</u>, 384 U.S. at 444.

All three defendants have premised their motions to suppress statements on the contention that because they were in custody and they were not given the <u>Miranda</u> warning, their statements should be suppressed.  The government disagrees, arguing that no <u>Miranda</u> warning was required because the totality of the circumstances shows

that no defendant was in custody. As such, the sole issue presented by the motions to suppress statements is whether any defendant was in custody at the time of their respective interviews and their oral and written statements were obtained.

When determining whether a suspect is in custody, courts consider the following six "indicia of custody":

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;

(2) whether the suspect possessed unrestrained freedom of movement during the questioning;

(3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4) whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) whether the atmosphere of the questioning was police dominated; and

(6) whether the suspect was placed under arrest at the termination of the questioning.

Griffin, 922 F.2d at 1349; see also, e.g., United States v. Axsom, 289 F.3d 496 (8th Cir. 2002). The first three factors are considered "mitigating factors" which, if found, tend to show that the suspect was not in custody. Griffin, 922 F.2d at 1349. The remaining three factors are characterized as "coercive factors" which, if found, tend to show the existence of custody. Id.

The determination of whether an individual is in custody at a particular time depends on "the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position

would have understood his situation' to be one of custody." Griffin, 922 F.2d at 1347 (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)). Moreover, the determination is based on the totality of the circumstances, with none of the factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor. Griffin, 922 F.2d at 1347. The ultimate inquiry is whether there was a formal arrest or restraint on a defendant's movement of the degree associated with a formal arrest. Stansbury v. California, 511 U.S. 318, 322 (1995).

Miranda warnings are not required merely because law enforcement officers question an individual who they suspect committed a crime. See United States v. Leese, 176 F.3d 740, 744 (3rd Cir. 1990) (citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). "Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." Mathiason, 429 U.S. at 495. See also United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002) ("Miranda warnings need not be imposed simply because the questioning takes place in a police station.").

With these principles in mind, the Court now examines each defendant's motion to suppress statements.

**B.** **David Richard Rosetter's Motion to Suppress Statements, Admissions, and Answers [Docket No. 66]**

David Rosetter moved to suppress his statements made at the NCIS office, arguing that he was confined against his will at the time of the interview, and that the circumstances surrounding his statement demonstrated that he was in custody and not free to leave when he was questioned, therefore requiring a reading of his Miranda rights. David Rosetter's Mem. in Support, p. 2 [Docket No. 88].

Based on the totality of the circumstances and examination of the six indicia of custody set forth in <u>Griffin</u>, the Court finds that David was not in custody during the interview at NCIS on January 14, 2009. Initially, David was informed that he did not have to speak to Agent Dudley if he did not want to do so, he was asked if he would be willing to do so and he agreed. Furthermore, upon arrival at the NCIS office, Agent Dudley reviewed with David that he was there voluntarily and that any statements he made would be voluntary. David was never handcuffed and he was not restrained in any manner at his office or during the interview at NCIS. The interview at NCIS took place in a large conference room, with open doors, and there is no evidence that David was physically unable to leave. In fact, David was left alone on several occasions. Although David did not initiate contact with law enforcement, he did agree to go with the agents to the NCIS office to continue the interview. There, he voluntarily agreed to answer all the questions of the agents and never refused to answer any questions.

There was also no evidence or suggestion that strong-arm tactics or deception were employed by the agents who interviewed David. Agent Dudley introduced himself as an FBI agent and asked if he could speak with David. The tone of the interview was relaxed and conversational, David was not threatened and the agents made no promises to him except that they would convey his cooperation to the prosecuting authorities. Agent Dudley's weapon was concealed, and he was dressed down.

Additionally, the atmosphere of the interview at NCIS was not dominated by law enforcement. In evaluating the factor of police domination, the Court considers the place and length of the interrogation, whether the police controlled the interrogation site and dictated the course of conduct of the suspect and other individuals, and whether the

suspect was removed "from the presence of family, friends, or colleagues who might lend moral support during the questioning." Griffin, 922 F.2d at 1352. In this case, there were two agents and David in a large conference room. Although the interview took place at NCIS, Agent Dudley testified that there were not many people around the NCIS office. Also, David had a cell phone with him and took at call from Fia at one point. See United States v. LeBrun, 363 F.3d 715, 722 (8th Cir. 2004) (finding that a cell phone provides "a line of communication between [defendant] and the outside world and to some extent mitigated the incommunicado nature of interrogations with which the Miranda court was concerned and the psychological pressure associated with being isolated in an interview room."). Finally, David was not placed under arrest at the conclusion of the interview.[5] See LeBrun, 363 F.3d at 722 ("stating that the lack of arrest was a "'very important factor weighing against custody.'") quoting Galceran, 301 F.3d at 931. Instead, he was given a ride back to the Base by the agents and then with his permission, to go pick up his son.

In California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam), the Supreme Court held that a person is not in custody if "the suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police after a brief interview." Such is the case here. In light of the above facts and analysis, the Court concludes that David was not in custody during the interview at NCIS on January 14, 2009. As such, he was not entitled to Miranda

---

[5] According to the Government, none of the defendants were arrested and all appeared on a summons following the Indictment. Gov't Response, p. 5 [Docket No. 90].

warnings and his motion to suppress statements made during the January 14, 2009 interview at NCIS should be denied.

## C. Laumatafiafia T. Rosetter's Motion to Suppress Statements Made by Defendant [Docket No. 37]

Fia moved to suppress all of her oral and written statements based on the contention that she was in custody at the time the statements were made and she was not provided with Miranda rights. Fia's Mem., pp. 1-6 [Docket No. 87]. Fia's arguments are restricted to her interview at the NCIS office, rather than the initial portion of the interview that occurred at the Rosetter residence. Id.

With regard to the first Griffin factor, Fia contended that because she was not specifically told that she was free to leave or free to terminate the interview, that factor is evidence of the custodial nature of the encounter. Id., p. 3. This contention ignores that fact that Fia was told that her cooperation was voluntary. Agent Dudley told Fia that providing a written statement was voluntary and she did not have to do it, it was a serious matter that would be turned over to a prosecutor to examine for criminal charges, and again told Fia she did not have to provide a written statement if she did not want to do so. Notwithstanding these statements, Fia wanted to give her version.

In Yarborough v. Alvarado, 541 U.S. 652, 664-65 (2004), the Supreme Court found that the fact that the suspect was not told that he was free to leave weighed in favor of a finding of custody; however, in the same case, the Court considered the fact that the police did not suggest the suspect would be placed under arrest weighed in favor of a finding that the suspect was not in custody. Although Agent Dudley never told Fia that she was free to leave or that she was not going to be arrested, he did tell her that her cooperation was voluntary, and like Yarborough, there is no evidence that

Agent Dudley suggested that Fia was in custody or that Fia believed she was in custody or was about to be taken into custody. The Court finds that Agent Dudley's repeated instruction to Fia that her cooperation was voluntary, in conjunction with the fact that the agents did not suggest to Fia that she would be placed under arrest, tips the scale in favor a finding that Fia was not in custody.

Regarding the second <u>Griffin</u> factor, Fia asserted that she was not in possession of unrestrained freedom of movement because she was asked to come to a secure police station on a military base, and was transported there with two agents in their vehicle, with no means to leave if she wanted. Fia's Mem., pp. 3-4. However, this contention again disregards the fact that Fia agreed to continue the interview at the NCIS office. The record establishes that because the agents did not want to continue questioning Fia in the presence of her children and wanted to allow David to return their son to the home, they asked Fia if she had any objection to continuing the interview at NCIS. Fia stated she had no objection and was willing to accompany the agents to NCIS. The agents and Fia did not leave immediately; instead they waited at the house until David returned, and while waiting, Fia offered the agents a bottle of water and received a phone call from Tau who told that the FBI was there and she was speaking to them.

Furthermore, during the interview, Fia was told she could go to the restroom and get a snack, and after her interview was terminated, Fia was given the choice of leaving or walking around. Fia did not leave because she was restrained but because she wanted to stay with the agents and wait for Tau to arrive. Fia then voluntarily waited at the NCIS building and took a nap until her sister's interview was over. On these facts, it

is disingenuous to suggest that Fia had no means to leave – she could have walked out of the NCIS office while Tau was being interviewed. Also, while Fia may not have driven to the Naval Base in her own car, she was not necessarily dependent solely upon the agents for transportation and could have called someone for a ride. See LeBrun, 363 F.3d at 723 (noting LeBrun was not dependent upon authorities for transportation from the highway patrol station where he was being interviewed because he "could have easily arranged for alternative transportation by calling a coworker, a friend, a relative, his spouse, or even a taxicab."). The second Griffin factor weighs against a finding of custody.

Fia did not address the third Griffin factor, which is whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions. The Court finds that this factor weighs against a finding of custody. Fia agreed to be interviewed both at home and at the NCIS office, and Agent Dudley repeatedly described her as chatty and extremely cooperative, friendly and cordial throughout the interview at the house and at the NCIS office. She also thanked Agent Dudley for pointing out to her that her hatred of the Rosetters had come back to hurt her children. Fia's cooperativeness weighs against a finding of custody. See United States v. Axsom, 289 F.3d 496, 501 (8th Cir. 2002) (third Griffin factor mitigated against a finding of custody where defendant was extremely friendly and cooperative).

As to the fourth Griffin factor bearing on strong arm tactics or deceptive stratagems, Fia contended that Agent Dudley told her that David was waiting for a phone call stating that she would go to the NCIS station to continue the interview before he could return home, and that it was her understanding that neither David nor her son

would be permitted to return home unless she agreed to continue the interrogation at the NCIS office.  Fia's Mem., p. 4.  This argument is unsupported by the testimony.  Fia agreed to be questioned at the NCIS station.  Agent Dudley testified that the reason for moving the interview to the NCIS office was because they did not want to take a statement with children running around and they wanted to give David the opportunity to bring home their son.  The Court also observes that Fia told Tau that she had been treated well by the agents, and that Tau should be straight with them.

With respect to the fifth Griffin factor, which examines whether the atmosphere was police dominated, Fia pointed to the fact that she was interviewed in a room at a police station (the NCIS office).  While the location of the interview is a consideration, the mere fact that Fia was interviewed at a law enforcement office does not, in itself, lead to the conclusion that she was subjected to a police-dominated atmosphere.  See Mathiason, 429 U.S. at 495; LeBrun, 363 F.3d at 720 ("it cannot be disputed that the warnings were not required here simply because the questioning [took] place in the station house.") (citation omitted).  Fia was alone with the two agents, and the rest of the NCIS office was empty.  This factor weighs against a finding of custody.

Finally, the sixth Griffin factor calls for the consideration of whether Fia was placed under arrest at the end of the questioning.  She was not.  See Yarborough, 541 U.S at 664 (suspect went home from the police station at the end of the interview, suggesting a finding that suspect was not in custody).  Instead, she and Tau drove home following Tau's interview.  This factor weighs against a finding of custody.

In light of the above facts and analysis, the Court concludes that Fia was not in custody during the interview at NCIS on January 14, 2009.  As such, she was not

entitled to <u>Miranda</u> warnings and her motion to suppress statements made during the January 14, 2009 interview at NCIS should be denied.

**D. <u>Vatauomalao Dorthea Tafaoa's Motion for Suppression of Statements [Docket No. 44]</u>**

In support of her motion to suppress the statements she made at the NCIS station, Tau contended that she was in custody and entitled to <u>Miranda warnings</u>. Tau addressed each of the six <u>Griffin</u> factors.

Regarding whether she was informed of the voluntary nature of the questioning, Tau asserted that she was never informed that she was free to leave, that she could refuse to answer, or that she was not under arrest. Tau's Mem., p. 10. All of this is true. However, Agent Dudley testified that prior to the interviews of defendants, he informed each of them that they did not have to speak with him and asked each of them if they were willing to speak with him. Further, prior to Tau providing her written statement, Agent Dudley told her:

> [T]his was her chance to put it in her words the way she wanted it told, that we were going to do a report, and that's where -- you know, I told her that she didn't have to, and she kept saying, "I want to cooperate." She repeated numerous times throughout the interview, "I want to cooperate fully." "I want to be fully cooperative." And we repeated the fact that, you know, criminal charges could result but that we weren't the ones to make that decision, but she should know that could happen.

Tr. 61-62.

As the Court found in its examination of Fia's interview, Agent Dudley's statements to Tau that her cooperation was voluntary and that she did not have to provide a statement, in conjunction with the fact that the agents did not suggest to Tau that she would be placed under arrest, tips the scale in favor a finding that Tau was not in custody.

Tau also claimed that she was restrained by her location and circumstances because she was escorted by an FBI agent onto a Naval Base, brought to a secure criminal investigation facility, and taken to a small room on the second floor. Tau's Mem, p. 12. Tau argued that because she had to travel through a security checkpoint, she would not have been able to leave if she did not have military identification. Id., p. 13. As an initial matter, it is important to remember that Tau agreed to come to the NCIS office on her own accord and drove to the office in her own car. Further, like Fia, the Court observes that there was nothing preventing Tau from leaving the NCIS building. In fact, there is simply no evidence before the Court regarding the procedures on the military base, and no one knows for certain whether Tau would or would not have been able to leave, or whether she did or did not have military identification as a relative of a naval official. Agent Dudley surmised that Tau may have needed identification to pass through the checkpoints, but also unequivocally stated that he did not know the procedures on the base. The fact of the matter is that after Tau's interview was over, Tau and Fia did leave the NCIS office in Tau's car.

Tau also asserted that she was effectively restrained inside the interview room because it was a small room without many places to sit, citing United States v. Aragon-Ruiz, 551 F.Supp. 2d 904, 912 (D.Minn. 2008). The Court does not find the facts in Aragon-Ruiz comparable. In Aragon-Ruiz, the defendant was at home sleeping when he was awakened by federal agents and detained in his kitchen by four armed agents while nine to eleven agents in raid gear and firearms patrolled in and around the house. Id. at 912. Here, Tau was alone with two agents, who were dressed in casual

clothing and whose firearms were concealed, in an otherwise empty NCIS office. This factor does not weigh in favor of a finding of custody.

With regard to the third <u>Griffin</u> factor, Tau contended that she did not initiate the interview. Tau's Mem., p. 14. This is correct. But this factor also takes into consideration whether a suspect voluntarily acquiesced to requests to respond to questioning. Here, Tau agreed to come to the NCIS office, agreed to meet the agent at David and Fia's residence so that she could follow him to the office, and Agent Dudley testified that Tau was extremely cooperative and seemed eager to tell the agents about what the Rosetters had put her family through. Tau never refused to answer any questions. Therefore, the third factor weighs against a finding that Tau was in custody during the interview.

Regarding the fourth <u>Griffin</u> factor, Tau argued that she was subjected to deceptive stratagems because Agent Dudley created a situation where Fia would be detained at the NCIS facility to place pressure on Tau to provide a statement. Tau's Mem., p. 15. This argument is not persuasive. First, as discussed above, the Court does not find that Fia was detained at the NCIS office; she chose to stay and wait for Tau. Furthermore, there is no testimony that Tau was ever told by agents or by Fia that Fia could not leave the office unless Tau gave a statement, or that Fia was obligated to wait at the NCIS station for Tau to give a statement. The only testimony is that Fia called Tau for Agent Dudley, and that Fia told Tau that the agents had treated her well and that Tau should be straight with them. Third, under threat of perjury, Tau stated she had been treated fairly by the agents and they were "straight-up" with her at all

times.  Gov't Ex. 10, p. 4.  Based on this record, the Court does not find that deceptive stratagems were utilized by the agents.  This factor weighs against a finding of custody.

With respect to the fifth <u>Griffin</u> factor, Tau contended that she was interrogated in a police-dominated atmosphere, "questioned inside multiple rings of military and governmental security."  Tau's Mem., p. 16.  This argument does not comport with the evidence.  According to Agent Dudley, Tau was alone with two FBI agents in an otherwise empty room, the agents were casually dressed, their firearms were concealed, the door to the interview room was open, and the NCIS office was otherwise empty.  The Court does not find this to rise to the level of a police dominated atmosphere.  Furthermore, Tau's argument that she was not able to speak to her sister at the NCIS facility, isolating her from moral support, is not corroborated by the testimony.  There is no testimony as to whether Tau could or could not see Fia before her interview, or even whether she did or did not see her before the interview.  This factor weighs against a finding of custody.

Finally, Tau contended that her arrest was a "foregone conclusion," and that Agent Dudley knew Tau would be arrested after he obtained a confession.  Tau's Mem., p. 17.  This argument is unsubstantiated.  The simple fact is that Tau was not arrested at the conclusion of the interview, and according to the Government, was never arrested.  Therefore, this factor weighs against a finding of custody.

In light of the above facts and analysis, the Court concludes that Tau was not in custody during the interview at NCIS on January 14, 2009.  As such, she was not entitled to <u>Miranda</u> warnings and her motion to suppress statements made during the January 14, 2009 interview at NCIS should be denied.

## E.    Conclusion

Based on the testimony and evidence presented at the motions hearing, the Court finds that a reasonable person in each of the defendant's position would not have believed that he or she was in custody.  On the one hand, it is evident that all of the interviews took place at the NCIS office on a military base and that none of the defendants were informed that they were free to leave or would not be arrested prior to being interviewed.  On the other hand, all of the defendants were informed that they did not need to speak to the agents, all were asked if they would be willing to do so and all agreed to do so.  Further, all of the defendants agreed to come to the NCIS office voluntarily and no evidence was presented to establish that they could not have left the interview room or the NCIS office at any time.  This evidence, which was applicable to all defendants, in conjunction with the particular events leading up to the interview of each defendant, at the interview and following the interview, leads this Court to conclude that based on the totality of the circumstances, none of the defendants were in custody at the time they spoke to agents and gave their written statements.  On this basis, the Court recommends that the motions to suppress by all defendants be denied.

## V.    RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein,

**IT IS RECOMMENDED THAT:**

1.    Defendant David Richard Rosetter's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 65] be DENIED;

2.     Defendant David Richard Rosetter's Motion to Suppress Statements, Admissions, and Answers [Docket No. 66] be DENIED;

3.     Defendant Laumatafiafia T. Rosetter's Motion to Suppress All Evidence Obtained from Unlawful Searches and Seizures [Docket No. 35] be DENIED;

4.     Defendant Laumatafiafia T. Rosetter's Motion to Suppress Statements Made by Defendant [Docket No. 37] be DENIED;

5.     Defendant Laumatafiafia T. Rosetter's Motion to Suppress All Electronic Surveillance Evidence and All Disclosed Electronic Communications and Any Evidence Derived Therefrom [Docket No. 38] be DENIED;

6.     Defendant Vatauomalao Dorthea Tafaoa's Motion for Suppression of Physical Evidence [Docket No. 42] be DENIED; and

7.     Defendant Vatauomalao Dorthea Tafaoa's Motion for Suppression of Statements [Docket No. 44] be DENIED.

Dated:     October 1, 2010

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

**NOTICE**

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **October 15, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which

objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **October 15, 2010**.